# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND
### (Northern Division)

------------------------------------------------------------------------ x

PPL ENERGYPLUS, LLC (2 North Ninth Street, Allentown, PA 18101); PPL BRUNNER ISLAND, LLC (2 North Ninth Street, Allentown, PA 18101); PPL HOLTWOOD, LLC (2 North Ninth Street, Allentown, PA 18101); PPL MARTINS CREEK, LLC (2 North Ninth Street, Allentown, PA 18101); PPL MONTOUR, LLC (2 North Ninth Street, Allentown, PA 18101); PPL SUSQUEHANNA, LLC (2 North Ninth Street, Allentown, PA 18101); LOWER MOUNT BETHEL ENERGY, LLC (2 North Ninth Street, Allentown, PA 18101); PPL NEW JERSEY SOLAR, LLC (2 North Ninth Street, Allentown, PA 18101); PPL NEW JERSEY BIOGAS, LLC (2 North Ninth Street, Allentown, PA 18101); PPL RENEWABLE ENERGY, LLC (2 North Ninth Street, Allentown, PA 18101); PSEG POWER, LLC (80 Park Plaza – T25, Newark, New Jersey 07102-4194); and ESSENTIAL POWER, LLC (99 Wood Ave. S., Suite 200, Iselin, NJ 08830).

                   Plaintiffs,

       v.

DOUGLAS R. M. NAZARIAN, in his official capacity as Chairman of the Maryland Public Service Commission (William Donald Schaefer Tower, 6 St. Paul St., 16th Floor, Baltimore, MD 21202); HAROLD WILLIAMS, in his official capacity as Commissioner of the Maryland Public Service Commission (William Donald Schaefer Tower, 6 St. Paul St., 16th Floor, Baltimore, MD 21202); LAWRENCE BRENNER, in his official capacity as Commissioner of the Maryland Public Service Commission (William Donald Schaefer Tower, 6 St. Paul St., 16th Floor, Baltimore, MD 21202); KELLY SPEAKES-BACKMAN, in her official capacity as Commissioner of the Maryland Public Service Commission (William Donald Schaefer Tower, 6 St. Paul St., 16th Floor, Baltimore, MD 21202); and W. KEVIN HUGHES, in his official capacity as Commissioner of the Maryland Public Service Commission (William Donald Schaefer Tower, 6 St. Paul St., 16th Floor, Baltimore, MD 21202).

                  Defendants.

------------------------------------------------------------------------ X

*Document electronically filed.*

**Civil Action No.**
_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs and their principal places of business are as follows:  PPL Parties[1] (2 North Ninth Street, Allentown, Pennsylvania 18101); PSEG Power, LLC (80 Park Plaza – T25, Newark, New Jersey 07102-4194); and Essential Power, LLC (99 Wood Ave. S., Suite 200, Iselin, New Jersey 08830).

Plaintiffs, by their attorneys, hereby file this action for declaratory and injunctive relief against Defendants Douglas R. M. Nazarian (in his official capacity as Chairman of the Maryland Public Service Commission, and not individually), and Harold Williams, Lawrence Brenner, Kelly Speakes-Backman, and W. Kevin Hughes (in their official capacities as Commissioners of the Maryland Public Service Commission, and not individually).  The Public Service Commission's principal place of business is William Donald Schaefer Tower, 6 St. Paul St., 16th Floor, Baltimore, Maryland 21202.  In support of their complaint, Plaintiffs state as follows:

## NATURE OF THE ACTION

1.     Wholesale electricity markets are complex, interstate, and regulated exclusively by the Federal Energy Regulatory Commission ("FERC") under Part II of the Federal Power Act ("FPA"), 16 U.S.C. § 824.  Two electricity products are relevant to this dispute.  First, FERC has exclusive authority over all aspects of wholesale markets for energy, which is the actual electricity sold by generators to electric distribution companies

---

[1]     The "PPL Parties" are Plaintiffs PPL EnergyPlus, LLC; PPL Brunner Island, LLC; PPL Holtwood, LLC; PPL Martins Creek, LLC; PPL Montour, LLC; PPL Susquehanna, LLC; Lower Mount Bethel Energy, LLC; PPL New Jersey Solar, LLC; PPL New Jersey Biogas, LLC; and PPL Renewable Energy, LLC, which are generation and marketing subsidiaries of PPL Corporation.

("EDCs"), such as public utilities, which, in turn, re-sell in the retail market to electricity end-users. Energy turns the lights on and powers electrical equipment. Second, FERC regulates the market for wholesale electric "capacity." Capacity is not electricity itself, but a commitment to provide that energy to meet future demand. Capacity "amounts to a kind of call option that electricity transmitters purchase from parties–generally, generators–who can either produce more or consume less when required." *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009).

2.      The Federal Power Act gives FERC exclusive jurisdiction to regulate wholesale electricity transactions in interstate commerce, including the transactions that affect the price for wholesale energy and capacity. It thereby establishes a bright line barring states from regulating such wholesale sales in any way. *See* 16 U.S.C. § 824(b)(1) (giving FERC exclusive jurisdiction over the sale of electricity "at wholesale").

3.      Maryland EDCs acquire energy and capacity to serve Maryland customers in wholesale markets that encompass a multi-state region that includes Maryland, the District of Columbia, and all or part of thirteen other states, referred to as the "PJM" region. The electricity transmission grid serving Maryland and the rest of the PJM region is part of an integrated interstate network. Electricity delivered into that grid by a particular generating facility cannot be segregated from electricity produced elsewhere and flowing in interstate commerce, with the result that all sales of energy and capacity within PJM occur in interstate commerce subject to regulation by Congress and FERC.

4.      In exercising its exclusive authority over wholesale markets for energy and capacity, FERC has directed that wholesale energy and capacity prices for the PJM region be set by competitive auctions administered by PJM Interconnection, LLC ("PJM") (referred to

as the "PJM markets"). FERC's approval of auction pricing is designed to provide appropriately calibrated incentives for the construction of new generation only when and where it is needed.

5.     This case concerns an administrative order issued by Maryland's Public Service Commission ("PSC" or "Commission") that seeks to regulate interstate wholesale transactions in both the energy and capacity markets, contrary to Congress's reservation of that role exclusively for federal regulators. On April 12, 2012, the PSC ordered ("April 12 Order" or "Order") certain Maryland EDCs to enter into contracts with selected generators that guarantee those generators fixed prices for their wholesale energy and capacity, with certain details regarding contractual language to be determined through negotiations and discussions involving the PSC's consultant, Boston Pacific. This April 12 Order usurps FERC's exclusive role in regulating wholesale transactions, disrupts the wholesale energy markets supervised by FERC, and does so in a manner calculated to favor new generating facilities located in Maryland over out-of-state facilities that participate in the same regional wholesale markets. The PSC's action violates the Supremacy Clause and the Dormant Commerce Clause of the U.S. Constitution.

6.     The April 12 Order directs three of Maryland's electric distribution companies – Baltimore Gas and Electric Company ("BGE"), Delmarva Power and Light Company ("DP&L"), and Potomac Electric Power Company ("Pepco") – to enter into a long-term "contract" with CPV Maryland, LLC ("CPV Maryland"), a generator hand-picked by the PSC to build a new generating facility located in Charles County Maryland in exchange for pricing guarantees established by the contracts. Those contracts are designed to "provid[e] compensation to [CPV Maryland] for Capacity and Energy," and do so by establishing a

4

"contract Capacity price" and "contract Energy price" that will be received by CPV

Maryland regardless of the prices established in the FERC-approved wholesale markets. *See*

*In re Whether New Generating Facilities are Needed to Meet Long-Term Demand for*

*Standard Offer Services*, Notice of Approval of Amended Request for Proposals for New

Generation to be Issued by Maryland Electric Distribution Companies, Request for Proposals

for Generation Capacity Resources under Long-Term Contracts at 5-6, Case No. 9214-098

(Md. PSC Dec. 8, 2011) ("RFP Order").  These pricing guarantees provide additional, state-

directed incentives for investment in CPV Maryland's proposed new Maryland facility.  The

April 12 Order contravenes Congress's determination in the Federal Power Act that the

regulation of wholesale electricity transactions are reserved for the federal government alone.

   7.   The contracts mandated by the April 12 Order will conform to the form

contract attached to the request for proposals that the PSC required each of Maryland's EDCs

to issue, and the April 12 Order together with the mandated Pricing Contracts will dictate the

State-directed pricing structure. *See In re New Facilities*, RFP Order Attachment 8,

Fixed/Indexed Pricing Contract for Differences ("Pricing Contract").  In order to receive

from the Maryland EDCs the favorable above-market prices set forth in the Pricing

Contracts, the April 12 Order requires that CPV Maryland successfully clear the PJM

capacity auctions.  That requirement effectively directs CPV Maryland to offer capacity in

those auctions at the lowest price allowed by PJM rules – no matter how low that price may

be, and regardless of the actual costs of the new capacity.  CPV Maryland need not worry

about how low its bidding pushes the market price, for the Pricing Contracts guarantee the

prices that it will be paid in all events.  Those contracts require the EDCs to make up the

difference between the market-clearing price (*i.e.*, the auction prices intended by FERC to

5

govern wholesale transactions) and the different price levels established in the Pricing Contracts. The April 12 Order will cause CPV Maryland to submit non-market-based bids into an auction that was intended by FERC to reflect competitive market conditions. In this way, the Order not only dictates the wholesale prices received by CPV Maryland, but skews the results of the PJM wholesale markets for all market participants. The Order attempts to secure for Maryland the advantages of the interstate wholesale markets approved by FERC, while simultaneously distorting those markets' federally governed pricing mechanisms.

8.      The April 12 Order and the mandated Pricing Contracts also dictate the manner in which CPV Maryland shall participate in PJM wholesale energy markets. CPV Maryland is required to sell energy in PJM day-ahead and real-time auctions based on specific cost of service factors. RFP Order, § 2.1.1; Pricing Contract, § 3.2.

9.      The PSC has taken the actions reflected in the April 12 Order to advance parochial state policies, reflecting its long-standing disagreement with FERC policy judgments in the regional PJM market. The PSC believes that FERC's policies have failed to attract sufficient investment in new generating facilities located in Maryland. The April 12 Order manifests the PSC's determination to override FERC's pricing signals with the PSC-determined energy and capacity prices. The April 12 Order also manifests the PSC's purpose and effect to favor wholesale generating facilities located within Maryland over out-of-state facilities.

10.     In recent years, the PSC has repeatedly complained that FERC's rules governing the wholesale capacity markets in the PJM region have failed to stimulate the addition of new capacity in Maryland. FERC has consistently rejected those challenges and re-affirmed PJM's market-based rules as the preferred manner of meeting electricity demand

needs in the region.  Maryland's response to FERC's decisions is the April 12 Order, which explicitly rejects reliance on PJM's RPM-based auction market pricing to meet Maryland's electricity needs.

11.     Under the Supremacy Clause of the United States Constitution, a state law is preempted when Congress intends federal law to occupy the field or when state regulation stands as an obstacle to the accomplishment of Congress's goals.

12.     Under Part II of the FPA, 16 U.S.C. § 824(b), Congress has occupied the field of wholesale electricity.  Only FERC may set wholesale rates or regulate wholesale markets. The Order invades this exclusive federal domain by requiring Maryland EDCs to provide a guaranteed fixed price for capacity to a favored generator (CPV Maryland) and by dictating to it how it must interact with the FERC-regulated wholesale capacity and energy auctions.

13.     The Order also contravenes and thus stands as an obstacle to FERC's regulatory policy choices.  FERC has determined that a market-based approach is the most efficient means of determining the wholesale price of energy and capacity, and signaling when and where new generation capacity is needed in PJM to meet reliability needs.  FERC's regulatory policy also calls for market-based pricing signals to determine the most effective means of satisfying those reliability needs, whether through investments in upgrades to existing units, investments in particular types of new generating facilities, or investments in demand response that reduce capacity needs at times of peak usage.  Yet the Order explicitly rejects this approach, overriding FERC's decision to use market forces to determine wholesale capacity prices and instead requiring Maryland EDCs to provide guaranteed fixed prices for energy and capacity to the specific gas-fired generating plant in Charles County Maryland that CPV Maryland proposes to build.  The Order thus guarantees that CPV

Maryland will receive artificially inflated prices for energy and capacity that are not available to existing generators, in derogation of FERC's determination that new generation units should not enjoy preferential compensation relative to other means of meeting the region's need for capacity to satisfy reliability needs.

14.     In addition, the Order violates the Commerce Clause of the United States Constitution.  The intent and effect of the Order is to favor an in-state producer over out-of-state competitors.  The Order explicitly promotes the construction of a new generation facility located within Maryland and the sale of energy and capacity from that facility, despite the fact that generators outside Maryland can and do participate in supplying energy and capacity to Maryland consumers.

15.     The Order stemmed directly from a 2009 effort by CPV Maryland to secure a subsidy for its construction and operation of a specific new generation facility in Charles County, Maryland.  CPV Maryland requested that the PSC require Maryland's EDCs to enter into long-term contracts to purchase the facility's output.  As the PSC's policy-making evolved, it broadened the process to solicit proposals from other in-state generators in addition to CPV Maryland, and also ostensibly to disguise its in-state preferences by requiring that the new facilities would have to be built in a portion of PJM known as the Southwest MAAC Locational Deliverability Area ("SWMAAC").  But with the exception of a portion of SWMAAC encompassing the District of Columbia, SWMAAC is entirely located within Maryland's boundaries.  On information and belief, the PSC was well aware no new generating facility meeting the PSC's program criteria could feasibly be constructed in the District of Columbia.  Ultimately and not surprisingly, the April 12 Order selected CPV Maryland as the favored generator to build, by June 1, 2015, the same Charles County

8

facility proposed by CPV Maryland in 2009.  The Order thus continues to impose requirements designed to reserve to a generating facility located inside Maryland a portion of the market for energy and capacity, and deny that opportunity to generation in every other State in the Union, including generation located in other States serving PJM markets.  The Commerce Clause forbids such in-state favoritism.

16.     In tacit recognition of the Order's illegality, the Commission has sought to insulate the Order from judicial challenge by the EDCs.  The Pricing Contracts they must enter purport to limit the EDCs' ability to seek relief from FERC or any court for disputes relating to those contracts.  Pricing Contract, § 12.5.

17.     For these reasons, explained further below, Plaintiffs are entitled to declaratory and injunctive relief barring the implementation of the Order.

## PARTIES

18.     Plaintiffs PPL Parties (PPL EnergyPlus, LLC; PPL Brunner Island, LLC; PPL Holtwood, LLC; PPL Martins Creek, LLC; PPL Montour, LLC; PPL Susquehanna, LLC; Lower Mount Bethel Energy, LLC; PPL New Jersey Solar, LLC; PPL New Jersey Biogas, LLC; and PPL Renewable Energy, LLC) are generation and marketing subsidiaries of PPL Corporation that are physically located in the PJM market and participate in PJM wholesale energy and capacity markets.  PPL Corporation, headquartered in Allentown, Pennsylvania, controls or owns about 19,000 megawatts of generating capacity in the United States, including the PJM market.

19.     Plaintiff PSEG Power, LLC ("PSEG Power") is a Delaware limited liability company, headquartered in Newark, New Jersey.  PSEG Power is a wholly-owned subsidiary of Public Service Enterprise Group, Inc.  PSEG Power owns approximately 11,850

megawatts of generating capacity in PJM.  PSEG Power sells energy and capacity at wholesale in interstate commerce, including in PJM's capacity and energy markets.

20.     Plaintiff Essential Power, LLC ("Essential Power") is a merchant generation company headquartered in Iselin, New Jersey.  Through its wholly owned subsidiaries, Essential Power owns a portfolio of 1,755 megawatts of natural gas fired and hydro-electric generating facilities located in the PJM and New England independent system operator markets.  One of Essential Power's subsidiaries, EP Rock Springs, LLC, owns a 352 MW simple cycle natural gas fueled generating facility located in Rising Sun, Maryland.

21.     Defendant Douglas R. M. Nazarian is the Chairman of the PSC.  Chairman Nazarian is sued in his official capacity for declaratory and injunctive relief only.

22.     Defendant Harold Williams is a Commissioner of the PSC.  Commissioner Williams is sued in his official capacity for declaratory and injunctive relief only.

23.     Defendant Lawrence Brenner is a Commissioner of the PSC.  Commissioner Brenner is sued in his official capacity for declaratory and injunctive relief only.

24.     Defendant Kelly Speakes-Backman is a Commissioner of the PSC.  Commissioner Speakes-Backman is sued in her official capacity for declaratory and injunctive relief only.

25.     Defendant W. Kevin Hughes is a Commissioner of the PSC.  Commissioner Hughes is sued in his official capacity for declaratory and injunctive relief only.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over Plaintiffs' claims arising under the U.S. Constitution and federal law pursuant to 28 U.S.C. § 1331.

27.     This Court has subject matter jurisdiction over Plaintiffs' claims arising under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1343.

28.     The Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

29.     This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure. This Court has personal jurisdiction over Defendants in their official capacity because each Defendant conducts a substantial portion of his or her duties as an officer of the PSC in the District of Maryland.  The PSC's main office is located in Baltimore, Maryland.

30.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the District of Maryland.

## FACTUAL ALLEGATIONS

**A.     The FERC Regulated Wholesale Markets for Energy and Capacity.**

31.     FERC has approved PJM, a regional transmission organization, to coordinate and administer the wholesale markets for electricity and for transmission in a multi-state region that includes Maryland, the District of Columbia, and all or part of thirteen other states, ranging from Illinois to the Eastern Seaboard, and from New Jersey to North Carolina.

32.     Generators of electricity in PJM's territory participate in PJM-administered markets for energy (i.e., electricity sold to EDCs for resale to retail customers, such as factories, homes, and businesses) as well as for wholesale "capacity," which is a forward commitment by generators to produce electricity if it is needed to meet future demand.  In PJM's capacity market, utilities purchase capacity from generators to ensure a supply of electricity at all times, including periods of peak demand.  Wholesale customers and their

end-user customers in Maryland thus satisfy their capacity and energy needs by purchasing

from generators located throughout the PJM region.

33.   A FERC tariff governs the PJM-administered markets for energy and

capacity. The tariff provides for market-based auctions that determine the respective prices

for energy and capacity sold at wholesale.

34.   The key component of PJM's capacity market tariff is the "Reliability Pricing

Model," or RPM, which establishes an annual "Base Residual Auction," through which PJM

administers procurements of capacity.  The Base Residual Auction requires generators to

make bids for capacity to be delivered in a delivery year that starts three years after the

auction.  Thus, the upcoming May 2012 capacity auction relates to capacity to be delivered in

the year 2015.  In the RPM auction, generators state an amount of capacity that they are

willing to sell and bid a price at which they are willing to offer that capacity.  PJM uses those

offers to create a supply curve and matches that supply curve against an administratively

determined demand curve based primarily on the marginal cost of building new generating

capacity (referred to as the cost of "new entry") to determine the price at which demand is

fully supplied.  That price is called the "market clearing price."

35.   Generators that offer to provide capacity at or below the market clearing price

successfully sell their capacity in the auction – *i.e.*, "clear" the auction – and receive the

market clearing price for that capacity.  If generators successfully clear their sales of capacity

in the RPM auction, PJM rules require that they also offer to sell the electricity they generate

in the separate PJM market for energy.

36.   The PJM capacity auction is designed to provide the marketplace with

incentives to add new generating capacity in the PJM region when, but only when, it is

economical to do so. *See generally PJM Interconnection, Inc.*, 117 F.E.R.C. ¶ 61,331 (2006). When the anticipated prices for capacity and energy yield a revenue stream over the life of the facility that exceeds the cost of new entry, generators have an incentive to increase supply by building additional generation capacity or by upgrading (or "uprating") existing plants, and purchasers have an incentive to curtail their use of electricity at times of peak demand. When the price for capacity falls below the cost of new entry, generators have an incentive to reduce supply by retiring inefficient plants. The capacity auction is designed so that, in the long run and on average, the price for capacity will provide a return that supports the cost of building new generating capacity.

37.     In addition, the RPM has a locational element, designed to take into account locational differences in the value of capacity caused by constraints on the transmission system. The locational element enables generation resources located in more constrained areas with less supply to receive a higher price for their capacity than generation resources located in other regions. The RPM thereby provides potential generation developers with price signals that reflect not only the cost of new entry, but also the areas in which new entry is needed the most.

38.     In recent years, the RPM price signals have indicated that there is no need for new generation facilities in PJM or in the SWMAAC portion of PJM. The reliability needs of Maryland consumers are thus capable of being met by existing generating and other capacity resources both within Maryland as well as outside Maryland and connected to Maryland by interstate transmission lines.

39.     When RPM market signals indicate that new capacity is needed, they are designed so that they induce investment in the most economical means of meeting capacity

needs, which may involve investment in a particular type of generating capacity, or may instead involve investment in other efforts, such as so-called "demand response" investments designed to serve a given amount of load with less generating capacity.

40.     The FERC-approved PJM tariff treats new capacity no differently than existing capacity, and FERC has previously rejected efforts to afford special treatment to new generation facilities.

**B.     Maryland's Well-Documented Dissatisfaction with FERC'S RPM Rates and Rules.**

41.     Over a period of years, Maryland has repeatedly expressed dissatisfaction with the FERC-approved RPM construct.  PSC vigorously opposed the adoption of the RPM construct, and has consistently sought to have FERC rescind its market-based approach to capacity pricing in favor of approaches that directly subsidize investment in new construction.  In 2008, for example, PSC argued to FERC that "RPM has not produced the intended benefits at reasonable costs." *Capacity Markets in Regions with Organized Electric Markets*, FERC Docket No. AD-08-4-000, Statement of Randall L. Speck on Behalf of the Maryland Public Service Commission, at 2 (May 7, 2008).  PSC understood that FERC intended the wholesale markets to function in a manner that sent pricing signals to parties considering investments in generating capacity, but PSC simply disagreed with that approach.  As PSC explained:  "Theoretical 'price signals' are not enough if they do not produce actual capacity resources that can be relied on to provide energy or demand reductions to satisfy peak loads.  The real test will come when new capacity resources are called on to perform, and in that sense, neither RPM nor FCM have yet proved that they will assure the reliability that they promise." *Id.* at 6.

42.     Following the first RPM capacity auction in 2008, PSC joined regulators in
other states challenging before FERC the electricity rates that resulted from RPM. *Maryland
Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, Docket No. EL08-67-000 (filed July 28,
2008).  After several years of unsuccessful litigation, the D.C. Circuit ultimately rejected
PSC's claim that RPM-driven wholesale prices were unjust and unreasonable, stating:
"[FERC] had a substantial basis on which to conclude that the RPM was an appropriate tool
for increasing reliability in electricity markets, that the RPM did precisely what it was
intended to do…and that the price hikes in its wake were attributable to legitimate causes."
*Maryland Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1285 (D.C. Cir. 2011).

43.     Even before the D.C. Circuit's ruling, on September 29, 2009, the PSC issued
Order No. 82936, which opened Case No. 9214 "to investigate whether it should exercise its
authority to order electric utilities to enter into long-term contracts to anchor new generation
or to construct, acquire, or lease, and operate, new electric generating facilities in Maryland."
*In re New Facilities*, Order No. 82936 Errata at 2-3, Case. No. 9214-001 (Md. PSC Sept. 29,
2009).  This order arose from CPV Maryland's July 2009 request that its proposed Charles
County facility be subsidized by state-mandated 20-year contracts with Maryland's EDCs.

44.     Contrary to FERC's goal of establishing regional, multi-state markets in
which capacity and energy are transacted at wholesale for the benefit of the entire region,
with Order No. 82936, PSC directed all interested parties to make "proposals for new
*Maryland-located* electric generating facilities." *Id.* at 3 (emphasis added).  Proposals
deemed acceptable by the PSC were thus limited to "Maryland-located" proposals for new
facilities, thereby excluding existing, non-Maryland-located generators from the process.
Shortly after issuing Order No. 82936, the PSC issued a clarification confirming that it

expected proposals to "[q]uantif[y] potential benefits for Maryland ratepayers and the Maryland electric grid." *In re New Facilities*, Letter Offering Some Clarification Regarding the Scope of Proposals, Case No. 9214-003 (Md. PSC Oct. 9, 2009). Order No. 82936 expressed clear policy preferences contrary to FERC's market-based approach: it anticipated a PSC-administered program that would force Maryland's EDCs into long-term contracts with new, select in-state generators in order to subsidize the entry of new in-state generation that the PSC believed would not otherwise occur under FERC's RPM construct.

45.     Order No. 82936 met with significant opposition based on the adverse consequences it would have for FERC-regulated PJM energy and capacity markets. For example, Constellation Energy Commodities Group cautioned, "rather than undertaking the matter on its own and forcing costs on Maryland ratepayers, Maryland should rely on PJM and its market participants to provide the most cost-effective regional solutions for regional reliability." *In re New Facilities*, Comments of Constellation Energy Commodities Group, Inc. and Constellation Newenergy, Inc., at 11, Case No. 9214-013 (Md. PSC Oct. 30, 2009). Constellation further commented, "it is clear that the PJM market already has ensured that there will be enough capacity to meet anticipated demand in Maryland in 2012 and beyond, *without* requiring Maryland's residents and small business to bear the cost of mandates for [EDCs] to enter into long-term contracts for, or to construct, own and operate, new generation resources." *Id.* at 8. Baltimore Gas and Electric Company similarly cautioned that "the Commission should assess the timing of and actual need for new generation before soliciting generation-related proposals." *In re New Facilities*, Comments of Baltimore Gas and Electric Company, at 3, Case No. 9214-009 (Md. PSC Oct. 30, 2009).

46.     PJM Power Providers Group's comments explained the flaws of Order No.

82936 as follows:

> The Order asks for proposals for new generation in Maryland, without
> any evaluation of whether new generation in Maryland is needed,
> without any determination of whether new Maryland-located
> generation is the best means of addressing the need, and without any
> guidance to bidders as to what they are being asked to bid on.
> Furthermore, the Order does not ask, much less answer, several crucial
> questions:  Why is existing generation being prohibited from
> competing with new generation to serve Maryland consumers? Why is
> out of state generation being discriminated against in favor of in state
> generation? Why are developers being asked to submit bids when the
> Commission has not issued a RFP?  Will the proposal for mandated
> generation or a market-based, fully competitive approach to generation
> supply result in better outcomes for the citizens of Maryland?

*In re New Facilities*, Comments of the PJM Power Providers Group, at 3, Case No. 9214-019

(Md. PSC Oct. 30, 2009).

47.     PSC ignored this opposition and instead listened to powerful proponents of

the proposed subsidy program in Maryland government.  Governor O'Malley, a proponent of

re-regulation of the energy and capacity markets, urged PSC to use its statutory powers to

facilitate new projects in Maryland and lower prices for Maryland ratepayers.  In his

December 18, 2009 comments on PSC's Order No. 82936, Governor O'Malley echoed

PSC's dissatisfaction with FERC's regulatory approach:

> Maryland cannot be held hostage to the failure of deregulation and
> broken energy markets. We can no longer afford to passively wait for
> competitive energy prices or pay higher incentives for merchant
> generation.  Marylanders deserve affordable, reliable and clean energy.
> To achieve these goals, I respectfully urge the Public Service
> Commission to use its existing statutory authority to take the following
> specific steps: 1. Order new generation to be built in Maryland under a
> traditional, rate-regulated, cost-of-service basis. . .

*In re New Facilities*, Maryland Energy Administration, Comments of Governor

Martin O'Malley, at 2-3, Case No. 9214-022 (Md. PSC Dec. 18, 2009).

17

48.     Governor O'Malley's letter to the PSC criticized FERC's market-based approach to wholesale regulation and the fundamental concept embodied in FERC's approach of establishing separate charges for capacity under the RPM construct.  He described RPM as follows:  "[a] perverse system of capacity charges imposed by the regional transmission organization, PJM Interconnection has been created, adding hundreds of dollars to residential bills with little benefit."  *Id.* at 2.

49.     PSC responded to comments regarding Order No. 82936 by issuing, in December 2010, a "Notice of Comment Period on Request for Proposals for New Generation Facilities."  *In re New Facilities*, Case No. 9214-034 (Md. PSC Dec. 29, 2010).  That Notice for the first time disclosed the specific means by which the PSC proposed to stimulate investment in new in-state generation capacity.  The PSC did not propose to order the State's EDCs to build new generation themselves, but to enter into long-term contracts with third-party generators that would build new in-state generating facilities in exchange for guaranteed pre-determined, non-market wholesale prices for the output of those facilities.

**C.     The RFP Process and Pricing Contracts.**

50.     The PSC's December 8, 2011 RFP Order spelled out in detail the PSC's program for subsidizing new in-state generating facilities.  The PSC ordered each of the State's EDCs to issue Requests for Proposals ("RFP") in a form specified by the PSC seeking proposals for the construction of new generating facilities.  Although the RFPs would ostensibly be issued by the EDCs, the PSC dictated their terms.  The RFP Order also specified that the PSC, not the EDCs, would select the winning proposal, and the PSC would order the EDCs to enter into the Pricing Contracts with the winner(s).

51.     In the Introduction to the RFP Order, the PSC made clear that its objective remained to intervene in PJM wholesale markets to override what it viewed as FERC's failed

18

regulatory policies. The RFP Order was designed "to address and mitigate … key risks faced by the State," including the "risk that RPM will not attract enough capacity." RFP Order at 2-3. The RFP Order specifically emphasized that the RPM's price signals had "failed to attract sufficient generation "in Maryland." *Id.* at 3.

52.     The RFP Order – and the terms of the Pricing Contract appended thereto – established the criteria for acceptable recipients of these state-ordered subsidies. Generators that wished to be selected by the PSC to be awarded a mandatory contract with Maryland's EDCs would have to submit a proposal containing proposed wholesale capacity and energy prices for a quantity of up to 1,500 MW and term of up to twenty years. RFP Order, §§ 2.2 & 2.3.

53.     The RFP Order required that the winning generator(s) build their facilities in SWMAAC – a region limited to portions of Maryland and the District of Columbia. RFP Order, § 2.2. The RFP Order thus explicitly discriminated against generation located in the other states in the PJM region that currently supply – and could in the future supply – Maryland's wholesale power needs. Specifically the RFP Order provided that "[t]he proposed Generation Capacity Resource must be capable of being interconnected to the System and *located within the Southwest MAAC Locational Deliverability Area (LDA)* as defined by PJM." RFP Order, § 6.5.1 (emphasis added). The PSC subsequently clarified that this requirement meant that the facility could not be physically located in another state. In response to a question whether the facility could "be built outside SWMACC and deliver power into SWMACC," PSC's "FAQs" guide states: "No. The unit must be physically located within the SWMACC LDA." *In re New Facilities*, Frequently Asked Questions,

Request for Proposals for Generation Capacity Resources Under Long-Term Contract, Q. 10, 11, Case No. 9214 (Md. PSC Oct. 10, 2011).

54.    With the exception of a portion of SWMAAC encompassing the District of Columbia, SWMAAC is entirely located within Maryland's boundaries.  On information and belief, the PSC was well aware that a significant new gas-fired generating facility meeting the criteria of the RFP Order could not feasibly be built in the District of Columbia.  Thus, the effect of the SWMAAC geographic siting requirement was to require the new generation be built in Maryland.

55.    The PSC's Maryland-specific locational requirement was imposed despite the fact that generating facilities located outside Maryland, and indeed throughout the PJM region, routinely serve and could in the future serve the wholesale capacity and energy needs of Maryland customers.  The Order's assertion that a generating facility must be physically located within SWMAAC in order to meet Maryland's reliability needs as a result of "transmission constraints" is incorrect.  The only constraint the PSC points to is the so-called "Western Constraint," which at times limits the import of power from sources west of Maryland.  Yet even when the Western Constraint is applicable, Maryland regularly sources from outside of the state, including generating facilities located in portions of the PJM region to the north of Maryland (*e.g.*, Pennsylvania).  PJM routinely assesses the effect of transmission constraints in limiting the ability of particular locations within PJM to obtain energy and capacity from other portions of PJM, and the most recent such assessment shows that SWMAAC does not face any such constraints and will not do so until 2019 even if (contrary to plan) no new transmission capabilities are added over the next seven years.

56.     The RFP Order thus imposes requirements designed to reserve to generating facilities located inside Maryland a portion of the regional, interstate PJM markets for energy and capacity, and deny those opportunities to generation located in other states within the PJM region.

57.     The RFP Order spelled out a process for selecting the winning bidder that confirms the PSC's motivation to favor in-state facilities, which would create jobs and investment in Maryland. Among the non-price-related criteria to be used in scoring proposals and selecting a winning generator, PSC considered "benefits to the State of Maryland." RFP Order, § 6.5.3. Moreover, proposals are to include "description of other reliability, economic, socioeconomic and environmental benefits that are likely to be realized in Maryland as a result of the Generation Capacity Resource, *e.g.* construction jobs, permanent employment during the operating period, tax effects, community improvements, other." RFP Order, § 6.1h. The PSC retained a consulting firm, Boston Pacific, to assist it in evaluating the bids based on the criteria set forth in the RFP Order.

58.     Other Maryland public officials have echoed the RFP's underlying motive to create jobs and help constituents in Maryland. The Maryland Energy Administration's January 13, 2012 letter commending PSC for issuing the RFP cites the fact that a new plant would "create in-state jobs" and Maryland's "vested interest" in "quality state industry development and job growth." *In re New Facilities*, Maryland Energy Administration Comments, at 3-4, Case No. 9214-121 (Md. PSC Jan. 13, 2012).

59.     The Pricing Contracts seek to preclude any legal challenge to the PSC's actions. Despite the fact that the RPM auction is a FERC-regulated market, and that sales of capacity through PJM are wholesale sales subject to exclusive FERC jurisdiction, the Order's

Pricing Contract purports to prohibit FERC from reviewing any issues arising from the contract. It also purports to preclude the EDCs from raising any challenge to the Pricing Contracts in the courts, instead requiring them to be brought before the PSC itself. Pricing Contract, § 12.5.

**D.    The April 2012 Order.**

60.    On April 12, 2012, the PSC issued Order No. 84815, selecting CPV Maryland from among three bids as the winner of the RFP process and approving CPV Maryland's 20-year pricing proposal. CPV Maryland was selected based on the analysis by Boston Pacific showing that CPV Maryland's proposal provided "the best price for [Standard-Offer Service] ratepayers over the life of the contract." April 12 Order at 26.

61.    The PSC directed CPV Maryland to build a 661 MW combined cycle facility located in Charles County, Maryland, to be operational by June 1, 2015.

62.    The Order leaves no doubt that PSC's objective is to intervene in PJM wholesale markets and override what it views as FERC's failed regulatory policies. The Order states: "we cannot rely on PJM's Reliability Model to deliver new generation to Maryland." April 12 Order at 22. The Order further states: "we do not find it reasonable to require us…to entrust the reliability of our State's electricity supply entirely to the operation of a capacity market that, by design, seeks to incent long-term assets solely through short term price signals." *Id.* at 22-23. In the PSC's view, Maryland should not have to wait to see if FERC's "capacity market construct someday might work" for Maryland, and should instead be free to choose to create incentives for new capacity on its own. *Id.* at 23.

63.    The April 12 Order requires three of Maryland's EDCs to enter into a Pricing Contract with CPV Maryland in the form attached to the RFP. Under those contracts, the Maryland's EDCs are required to pay CPV Maryland a guaranteed, fixed price approved by

22

the PSC for a pre-determined amount of energy and capacity, irrespective of the market

clearing price set for that energy and capacity by the PJM wholesale capacity or energy

auction. In exchange for these guarantees, CPV Maryland commits to build specific new

generating facilities located within Maryland and to pledge that generation to the PJM

auction market.

64.    The Pricing Contracts set prices for capacity and energy transacted in PJM's

wholesale markets. The PSC's RFP Order states that the Pricing Contracts are designed to

"provid[e] compensation to [CPV Maryland] for Capacity and Energy," and do so by

establishing a "contract Capacity price" and "contract Energy price," which differ from the

prices established in FERC-approved auction markets. RFP Order at 5-6. The RFP Order

also spells out that the Pricing Contracts will specify "Pricing for Capacity and "Pricing for

Energy." RFP Order, § 6.1.k.

65.    The April 12 Order and the Pricing Contracts explicitly contemplate the

physical delivery of electricity. The guaranteed prices will not be paid unless CPV Maryland

*actually sells* its energy and capacity at wholesale in the PJM market. The generator "may

not withhold generation resources from the Facility from any PJM Market in which it has

elected to participate either through its offering behavior or by incorrectly declaring

resources to be unavailable." Pricing Contract, § 3.2(b)(1). In addition, the Pricing

Contracts provide that the EDCs themselves may take delivery under the contract: The PSC

may order, upon recommendation of either the generator or the EDC, that "the Buyer [EDC]

take title to the Supplier's [CPV Maryland's] electricity products and services pursuant to

Section 4.1(b)." Pricing Contract, § 3.2(d); *see also id.* § 4.1(b).

**E.     The Order Will Distort the FERC-Regulated Wholesale Markets.**

66.     The April 12 Order and the Pricing Contracts required by that Order will distort the functioning of the PJM wholesale capacity and energy markets regulated by FERC.  The capacity prices guaranteed in the Pricing Contacts are above the expected market-wide price levels in PJM.  The PSC acknowledges that rate-payers will pay more during the initial period of the contract as a result of these above-market guarantees (April 12 Order at 26) and it is likely that the levels specified in the Pricing Contracts will remain above-market throughout their 20-year terms.

67.     By subsidizing certain market participants with above-market prices, the PSC's April 12 Order will suppress the capacity prices received by *all other market participants*.  The Maryland PSC has acted to bring into the market specific new generation that would not have existed under the pricing signals delivered by FERC's market-based wholesale market regulation.

68.     The specific new generating facility approved by the PSC for the Pricing Contracts will be subsidized by the mandatory long-term contract providing guaranteed prices and revenues to be paid by three of Maryland's EDCs.

69.     When it first sought a subsidy for its proposed Charles County Maryland facility (which it referred to as the "St. Charles Project"), CPV Maryland explained how the Pricing Contract was needed to subsidize a plant that would not otherwise be built:

> As currently configured, the RPM is too short-term, too volatile, and too fraught with continued regulatory uncertainty to provide lenders with anything close to the certainty of a fixed revenue stream required for financing. A new capacity resource within a locational delivery area is allowed to lock in a "new entry price" for only a maximum of three years, and only under certain conditions.  For precisely these reasons, PJM asked FERC to approve various proposed changes to RPM, including a request for a 7-year term, which at that time

24

might at least have improved the prospects for financing projects such as the St. Charles Project. Indeed, the Maryland Commission, along with the Pennsylvania, New Jersey, Delaware and District of Columbia commissions argued that '[t]he uncontradicted evidence before the Maryland Commission demonstrates that five years is wholly inadequate to provide the revenue stream required for a project costing hundreds of millions of dollars.' Unfortunately, however, and strangely, given RPM's purpose to provide an accurate price signal to new generation, the FERC rejected PJM's proposal, finding that the longer term would result in price discrimination between existing resources and new generation suppliers.

*In the Matter of the Commission's Investigation of Investor-Owned Electric Companies'*

*Standard Offer Service for Residential and Small Commercial Customers in Maryland*,

Motion of CPV Maryland, LLC for an Order Requiring Investor-Owned Utilities to Enter

Into Long-Term Contracts for the Sale of Power from CPV Maryland, LLC's Proposed 640

MW Generating Facility In Charles County, Maryland and Request for Expedited Treatment,

Case No 9117 (Md. PSC, filed July 6, 2009).

70.     The participation of this subsidized new generating capacity in the PJM

wholesale markets will artificially cause market-wide prices to fall. Under the Pricing

Contract, the winning generator (CPV Maryland) is ineligible to receive monthly payment if

it does not "clear" the PJM's base residual auction ("BRA"). Pricing Contract, § 6.1.

Specifically, Section 6.1(a) provides that "[n]o Monthly Payment shall be provided during

any period in which the Supplier has not been selected to provide capacity in PJM's BRA."

*Id.* at § 6.1(a). In order to obtain the subsidy pricing guarantees, then, CPV Maryland will

bid its new capacity into the PJM interstate wholesale capacity auction at the lowest

permissible price – no matter how low that market price may be, and regardless of the actual

costs of the new capacity – so as to clear the market and collect the subsidies guaranteed by

the Pricing Contracts.  This will suppress market clearing prices, distorting the incentives that FERC intends for those markets to send.

71.     For each delivery month, if the fixed prices in CPV Maryland's RFP is higher than the resource clearing price set in the annual PJM's BRA, Maryland's utilities must make payments to the winning generators equal to the difference between the RFP price and the auction clearing price.  Pricing Contract, § 6.1.  In the unlikely event that the PJM market price is higher than a winning bidder's fixed RFP price, then the winning bidder must pay refunds to the public utilities to make up the difference.  Pricing Contract, § 6.1.

72.     The FERC-approved PJM tariff, by contrast, does not require new generators to offer their capacity into the RPM auctions, let alone "clear" their capacity in those auctions.  Instead, it is designed so that market forces control bidding behavior and thus the market-clearing price for capacity in the auction.

73.     The PSC will act to ensure that CPV Maryland's participation in PJM wholesale auction markets achieves the desired effect of suppressing market-wide prices, which Maryland has long believed are too high.  *See, e.g., Maryland Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, Docket No. EL08-67-000 (filed July 28, 2008) (challenging the electricity rates that resulted from RPM).  In addition, the PSC-mandated Pricing Contract further threatens to suppress prices, requiring CPV Maryland to "participate in those PJM Markets as . . . *approved by the MDPSC from time to time*."  Pricing Contract, § 3.2(a) (emphasis added).  CPV Maryland's bids in wholesale energy markets are required to be based on specific cost-based factors.  RPM Order, § 2.1.1.

74.     During 2011, FERC put in place a new "minimum offer pricing rule" that allowed PJM to set a minimum level for capacity bids in PJM's wholesale capacity (but not

energy) auctions.  The PSC was not deterred by this rule change, however, demonstrating

that the PSC expects CPV Maryland to be able to successfully clear at least one PJM auction

at the minimum price levels established by PJM under its FERC tariff.  Once that has been

achieved, CPV Maryland's bidding will not be constrained by the MOPR rule because the

rule does not apply to bids submitted by a generator that has cleared a single auction.  As a

result, CPV Maryland will have both the incentive and the ability to bid as low as zero to

ensure that their capacity clears the market, and that they therefore collect the guaranteed

prices stipulated in the Pricing Contracts, in the process distorting future market outcomes.

75.     The Independent Market Monitor ("Market Monitor") for the PJM region has

expressed concerns about the PSC's subsidized generation program.  The Market Monitor is

an entity established by FERC-approved tariff to objectively monitor the competitiveness of

PJM markets, investigate violations of PJM's market rules, recommend changes to those

rules, and prepare reports.  The Market Monitor objected to Maryland's RFP program as a

"procurement of capacity that is not needed for reliability; the procurement of capacity

through a process that is discriminatory because it excludes existing generation and non-gas

fired units; and the requirement to offer the procured capacity so that it clears in the PJM

capacity auctions." *In re New Facilities*, Comments of the Independent Market Monitor, at

2, Case No. 9214-126 (Md. PSC Jan. 23, 2012).  The Market Monitor warned that offering

capacity purchased through the RFP process in the PJM capacity auction would artificially

depress prices, negatively affect the incentives to build new generation and would likely

result in only subsidized units being built in the future.  *Id.* at 2-4.

76.     By distorting the pricing signals sent in the RPM auction, the subsidized entry

fostered by the Order will bring about precisely the harms that FERC sought to avoid when it

instituted market-based regulation.  In the short run, market pricing signals will be ignored, and Maryland ratepayers likely will bear the significant costs of paying for the building and maintenance of generation facilities that are not needed.  In the longer run, the divergence from FERC's market-based policies will become even more acute.  By artificially suppressing market-wide capacity and energy prices and creating an expectation that state-ordered subsidies will be available to meet any perceived need for new capacity, the PSC's action will foster an environment in which further state interference with FERC authority becomes the only way to encourage the construction of new capacity in PJM even in the event an actual need arises.  Other states may fell compelled to promote similar schemes to encourage the construction of new generation facilities in their territories, resulting in the overbuilding of new capacity and creating a dependency on subsidies.  Indeed, the State of New Jersey is attempting to implement a similar measure.  Once the market comes to rely on state-established wholesale pricing schemes, investment in new generation will perpetually depend on them rather than the market-based pricing signals as FERC intends.

**F.      The Order Will Harm Plaintiffs.**

77.      The April 12 Order will cause financial and pecuniary harm to the Plaintiffs. The 661 MW of subsidized new generation required by the April 12 Order and Pricing Contracts will suppress PJM market prices, thereby causing the Generator Plaintiffs, each of which participate in wholesale markets as a seller of energy and capacity into Maryland, to lose sales to the subsidized offerings of CPV Maryland and receive reduced revenues from the energy and capacity sales they continue to make in PJM markets.  Indeed, the Boston Pacific report the PSC relied on to choose CPV Maryland as the winning bidder states, unequivocally, that "these new units [from the winning bidder] would lower the energy

market price…" *In re New Facilities*, Memorandum, Boston Pacific's Final Shortlist

Evaluation, at 5 Case No. 9214-138 (Md. PSC Apr. 12, 2012).

78.     In addition, the expectation of suppressed market prices will reduce the profits

anticipated from investments in new generating assets in the PJM region, causing the

Generator Plaintiffs to forgo certain investments that would have been made absent the April

12 Order.

PJM's Independent Market Monitor has estimated that the Order would cost PJM suppliers

$1 billion annually.  *In re New Facilities*, Comments of the Independent Market Monitor for

PJM, at 4, Case No. 9214-063 (Md. PSC Jan. 28, 2011).

## CLAIMS FOR RELIEF

## COUNT I

### (Violation of the Supremacy Clause, U.S. Constitution, art. VI, cl. 2)

79.     Plaintiffs restate and incorporate by reference each and every allegation in

Paragraphs 1 through 78 as if fully set forth herein.

80.     Under the Supremacy Clause of the United States Constitution, a state law is

preempted when Congress intends federal law to occupy the field, as well as in cases where

the state law stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress.

81.     In passing the FPA, Congress granted FERC exclusive jurisdiction over the

field of wholesale electricity regulation.  Section 201(b) of the FPA, codified at 16 U.S.C. §

824(b), sets out the scope of federal regulatory power and draws a bright line between

mutually exclusive spheres of state and federal authority.  The FPA left no power to the

States to regulate wholesale electricity transactions, including wholesale sales of energy and capacity, in interstate commerce.

82.   ***Field Preemption***.  The Order is preempted because it intrudes on FERC's exclusive jurisdiction to regulate wholesale transactions for capacity and energy.  That is so in numerous respects:

a.   By guaranteeing CPV Maryland specific state-approved prices for wholesale capacity sold in the RPM auction – prices that may be well above the price at which that capacity cleared at auction – the Order invades FERC's exclusive jurisdiction to set wholesale prices.  Under the Pricing Contract, PSC approves guaranteed price to be paid by Maryland's EDCs to CPV Maryland for its sales of capacity in the FERC-regulated RPM auctions.  However, only FERC has authority to set or approve wholesale prices.

b.   The Order treads on FERC's exclusive jurisdiction because it purports to control CPV Maryland's bidding behavior in the wholesale capacity and energy markets.

c.   The Order purports to strip FERC of its exclusive jurisdiction to review wholesale transactions for justness and reasonableness, by compelling the contracting EDCs to involuntarily waive their rights (i) to present any dispute or issue in any forum other than the PSC and (ii) to seek an order from FERC under the FPA "changing any section of this Agreement specifying the pricing, charges, classifications or other economic terms agreed to by the parties."  Pricing Contract, §§ 12.5(a), (c).

83.   ***Conflict Preemption.***  The Order is preempted because it erects obstacles to FERC's achievement of its regulatory goals in the wholesale capacity and energy markets.

a.   The Order interferes with FERC's decision to have capacity prices in PJM set by market forces.  By encouraging a generator to bid in the PJM auction at artificially low

30

prices, even as that generator receives a guaranteed price for its capacity from Maryland utilities, the Order will distort the clearing price for capacity, which is a critical component of the FERC-regulated wholesale capacity market.

b.      The Order interferes with FERC's decision to structure the wholesale markets for capacity and energy on market-based principles in order to encourage the entry of new generating capacity in PJM only when and where, and in what form, such entry is needed. According to those market-based principles, new facilities are added only when anticipated capacity and energy revenues will yield an adequate return on investment over the new facility's life.  In this case, the price signals provided by the FERC-approved competitive markets indicate that new generation is not needed in Maryland.  The Order's RFP makes clear that PSC disagrees with the rules FERC and PJM have chosen to govern the capacity auction.  The Order seeks to circumvent those rules in order to foster new generation in Maryland even though the FERC-approved RPM has signaled that such new generation would not be needed.  The Order allows CPV Maryland to turn a profit even when selling capacity in the RPM auction at far below cost, by giving them a price guarantee outside of the auction.  The consequence will be that construction of new generation facilities will take place in Maryland in contravention of the economic signals sent by the RPM.

c.      The Order also interferes with FERC's design to provide incentives to add capacity when and where, and in what form, it is economical to do so, by permanently chilling private investment in new generation.  Private investors will be reluctant to construct any new generation, even when market signals indicate that such investment will be profitable, if new plants could lose expected market share to comparatively inefficient facilities that can sell capacity at artificially low prices owing to a state-ordered subsidy.

Private investors also will be reluctant to construct new generating facilities without first receiving the kind of price guarantee the Order provides.

     d.     The Order discriminates in favor of new generation and against existing generation, by guaranteeing a price for capacity sold by new generation facilities, but not by existing facilities. However, FERC has made clear that the issue of price discrimination based upon the age of a generating facility is an issue within its jurisdiction, and the Order therefore intrudes on FERC's jurisdiction.

     e.     If the Order is upheld, FERC may find it impossible to conduct market-based regulation of PJM's wholesale capacity market. Following Maryland's example, other States may be encouraged to promote the construction of new generation within their territories to bring jobs to the state, regardless of whether such generation is needed or economical. The result will be to unravel the market-based approach FERC has chosen to adopt.

     84.     If Maryland believes that the RPM does not create sufficient incentives to provide adequate capacity in Maryland, the appropriate course is for it to petition FERC to change RPM rules, or to require its local utilities to opt out of RPM altogether and instead meet their capacity needs through PJM's FERC-approved Fixed Resource Requirement Alternative ("FRR"). The FRR would require Maryland's utilities to obtain sufficient dedicated capacity resources to meet their needs, and would impose stringent limits on the ability of those utilities to participate in PJM capacity and energy markets. But Maryland has not proceeded down this path, no doubt because it wishes to take advantage of the many advantages of participation in FERC-regulated competitive energy and capacity markets. The Supremacy Clause forbids Maryland – dissatisfied with the outcomes of FERC's market-based regulatory framework – from pursuing its own regulatory program for interstate

wholesale electric energy and capacity sales at cross-purposes with that of FERC acting under authority of the Federal Power Act.

85.     Plaintiffs have no adequate remedy at law and no opportunity for compensation for the Order's violation of the Supremacy Clause.

86.     Plaintiffs will suffer irreparable harm by the violation of the Supremacy Clause, because Maryland's interference with the wholesale interstate capacity and energy markets will cause Plaintiffs to suffer substantial economic losses, and Maryland is immune from suit for retrospective relief.

87.     The public interest will be harmed by the violation of the Supremacy Clause because the Order frustrates Congress's desire to place wholesale capacity markets under the exclusive purview of FERC and, by interfering with the workings of RPM, will undermine FERC's policy choice to rely on market forces to signal the need for investment in additional capacity.  Additionally, Maryland ratepayers will be required to pay for the long-term, fixed-price contracts, which the Order requires Maryland utilities to enter into with a favored in-state generator, and bear the risk of paying substantial subsidies.

88.     Plaintiffs are entitled to judgment under 28 U.S.C. §§ 2201(a) and 2202, declaring that the Order violates the Supremacy Clause (Article VI, Clause 2) of the United States Constitution.

89.     Plaintiffs also are entitled for this reason to preliminary and permanent injunctive relief preventing the PSC from requiring the EDCs to execute the Pricing Contracts that are required by the Order.

90.     Granting the requested declaratory and injunctive relief will harm the PSC and the State less (if at all) than denying the relief would harm Plaintiffs.

## COUNT II

**(Violation of the Commerce Clause, U.S. Constitution, art. I, § 8, c. 3)**

91.     Plaintiffs restate and incorporate by reference each and every allegation in Paragraphs 1 through 90 as if fully set forth herein.

92.     The negative aspect of the Commerce Clause (known as the "Dormant Commerce Clause") erects a nearly per se rule against state laws favoring in-state economic interests over out-of-state economic interests.  States may not use their regulatory power to give in-state producers an advantage over producers located in other States.

93.     The Order violates the Dormant Commerce Clause because its intent and effect are to discriminate in favor of in-state generation and against out-of-state generation.

94.     First, energy and capacity that will be sold by CPV Maryland pursuant to the Pricing Contracts required by the April 12 Order will occur in interstate commerce.  The Order's intent and effect is to reserve to CPV Maryland (an instate producer) a guaranteed portion of the purchases of capacity and energy made by Maryland consumers, by mandating that Maryland utilities procure a portion of their energy and capacity from CPV Maryland's Charles County plant, thereby precluding out-of-state generation capable of serving Maryland from competing to supply that portion of the State's capacity and energy needs. The Order will have the intended effect of making capacity generated in the State constitute a larger share, and capacity generated outside the State a smaller share, of the total Maryland capacity market, in violation of the Dormant Commerce Clause.

95.     Second, the Order's RFP and the underlying comments state that a major purpose of the RFP is to create jobs and investment in Maryland.  Among the non-price related criteria to be used to selecting winning generators, PSC considered "benefits to the

State of Maryland." RFP Order, § 6.5.3. Moreover, to be a winning proposal, a generator must have included a "description of other reliability, economic, socioeconomic and environmental benefits that are likely to be realized in Maryland as a result of the Generation Capacity Resource, *e.g.* construction jobs, permanent employment during the operating period, tax effects, community improvements, other." RFP Order, § Section 6.1.h. Promoting in-state jobs and investment are not legitimate local purposes that justify a discriminatory law under the Dormant Commerce Clause.

96.     Third, the discriminatory intent and effect of the Order is reinforced by the fact that the April 12 Order contemplates that Maryland's EDCs will pass on to Maryland ratepayers the cost of their forced subsidy of CPV Maryland. The PSC would not have required Maryland consumers to foot the bill for these subsidies unless they were stimulating economic development within the State of Maryland.

97.     Because the Order is discriminatory in its intent and effect, it is subject to the strictest scrutiny. The Order does not survive that rigorous scrutiny because it does not advance a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. The purported justification for requiring the purchase of wholesale capacity and energy from a new facility located within Maryland – *i.e.*, supposed transmission constraints affecting SWMAAC – is pretextual. PJM has determined that there are no such constraints. Wholesale customers within Maryland (and SWMAAC) can meet their needs for capacity and energy by purchasing from generating facilities located outside Maryland/SWMAAC and transmitted to Maryland/SWMAAC over interstate transmission lines.

98.     Plaintiffs have no adequate remedy at law and no opportunity for compensation for the Order's violation of the Commerce Clause.

99.     Plaintiffs will suffer irreparable harm by the violation of the Commerce Clause, because such a violation by itself constitutes irreparable injury, and additionally because that irreparable injury is compounded by the significant but incalculable economic loss to Plaintiffs caused by Maryland's scheme to reserve a portion of the State's capacity needs for in-state generation.

100.    The public interest will be harmed by the violation of the Commerce Clause, because Maryland ratepayers will ultimately be required to pay for the long-term, fixed-price contracts which the Order requires Maryland utilities to enter into with favored in-state generators, and bear the risk of paying substantial subsidies.

101.    Plaintiffs are entitled to a judgment under 28 U.S.C. §§ 2201(a) and 2202, declaring that the Order violates the Commerce Clause (Article I, Section 8, Clause 3) of the United States Constitution.

102.    Plaintiffs also are entitled for this reason to preliminary and permanent injunctive relief preventing the PSC from putting any part of the Order into effect.

103.    Granting the requested declaratory and injunctive relief will harm the PSC and the State less (if at all) than denying the relief would harm Plaintiffs.

## COUNT III

### (Violation of 42 U.S.C. § 1983)

104.    Plaintiffs restate and incorporate by reference each and every allegation in Paragraphs 1 through 103 as if fully set forth herein.

105.    42 U.S.C. § 1983 provides a civil action under law or equity for a person who is deprived "of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under the color of "any statute, ordinance, regulation, custom, or usage, of any State."

106.    Plaintiffs are entitled to a judgment under 42 U.S.C. § 1983 because they were deprived of their stated constitutional rights by Defendants, who were Maryland state officials, acting under the color of Maryland law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter an order:

a.    Declaring that the Order violates the Supremacy Clause and the Commerce Clause of the United States Constitution.

b.    Declaring that the Defendants' promulgation and enforcement of the Order impermissibly deprives Plaintiffs of their rights in violation of 42 U.S.C. §§ 1983.

c.    Enjoining Defendants from executing or otherwise putting into effect any part of the Order.

d.    Awarding Plaintiffs their reasonable attorneys' fees under 42 U.S.C. §§ 1983 and 1988.

e.    Awarding Plaintiffs such further relief as the Court may deem just and equitable.

[signature on next page]

Dated: April 27, 2012.                    Respectfully submitted,


                                          _____/s/_____
                                          Andrew Jay Graham (Bar No. 00080)
                                          Geoffrey H. Genth (Bar No. 08735)
                                          John A. Bourgeois (Bar No. 11834)
                                          KRAMON & GRAHAM, P.A.
                                          One South Street, Suite 2600
                                          Baltimore, Maryland 21202-3201
                                          Telephone:    (410) 752-6030
                                          Facsimile:    (410) 539-1269
                                          E-mail:       agraham@kg-law.com
                                                        ggenth@kg-law.com
                                                        jbourgeois@kg-law.com

                                          *Attorneys for Plaintiffs*

OF COUNSEL:

David L. Meyer
Nicholas G. Miranda
MORRISON & FOERSTER
2000 Pennsylvania Avenue, NW, Suite 6000
Washington, D.C. 20006-1888
Telephone:    (202) 887-1500
Facsimile:    (202) 887-0763 or
              (202) 887-0764
E-mail:       dmeyer@mofo.com
              nmiranda@mofo.com
*Of Counsel for PPL Parties*


Richard L. Roberts
Shannen W. Coffin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902
E-mail:       rroberts@steptoe.com
              scoffin@steptoe.com
*Of Counsel for PSEG Power, LLC*

I. David Rosenstein
Vice President and General Counsel
Essential Power, LLC
99 Wood Avenue South
Iselin, New Jersey 08830
Telephone:      (732) 623-8700
Facsimile:      (732) 632-9889
E-mail:         david.rosenstein@essentialpowerllc.com
*Of Counsel for Essential Power, LLC*